# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **UNITED STATES ex rel. JAMES KRAXBERGER**, | ) ) ) | |
| Relator/Qui Plaintiff, | ) ) | |
| v. | ) ) | Case. No. 11-CV-0590-W-ODS |
| **KANSAS CITY POWER & LIGHT CO.**, | ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM IN SUPPORT OF DEFENDANT KCP&L'S MOTION TO DISMISS

May 15, 2012

Respectfully submitted,

**GRAVES BARTLE MARCUS
& GARRETT LLC**

Todd P. Graves, Mo. Bar No. 41319
Edward D. Greim, Mo. Bar No. 54034
Clayton J. Callen, Mo. Bar No. 59885
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Telephone: (816) 256-4144
Facsimile: (816) 817-0863
edgreim@gbmglaw.com

*Counsel for Defendant KCP&L*

## TABLE OF CONTENTS

I.      Introduction ................................................................................................................1

II.     Alleged Factual Background ......................................................................................1

III.    Argument ...................................................................................................................5

        a.  Legal Standard ...............................................................................................5

        b.  False Claims Act (31 U.S.C. § 3729) ............................................................5

        c.  Counts I and II Fail As a Matter of Law .......................................................7

            1.  Certifications Were Not Materially False Because
                Compliance Was Not a Precondition For Payment ..............................8

                a.  FAR 52.203-3 ..............................................................................10

                b.  FAR 52.203.11 .............................................................................11

                c.  18 U.S.C. § 201 and 10 U.S.C. § 2306 .......................................13

            2.  Relator's Fraudulent Inducement Claim Fails
                Because the Filed Rate Doctrine Does Not Allow
                GSA to Enforce Alleged "Low Rate" Promises or
                Recover Fraud Damages Due to Alleged Reliance
                on a Rate Lower than the Filed Rate ...................................................14

                d.  Count III Fails As a Matter of Law .............................................18

IV.     Conclusion ...............................................................................................................18

i

# Table of Authorities

## Cases

Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,
    524 U.S. 214 (1998)........................................................................16

Bauer v. Southwestern Bell Tel. Co.,
    958 S.W.2d 568 (Mo. App. E.D. 1997) ...............................................15, 16, 17

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)..........................................................................5

Crumley v. Time Warner Cable, Inc.,
    556 F.3d 879 (8th Cir. 2009) ...............................................16, 17

Firstcom, Inc. v. Qwest Corp.,
    555 F.3d 669 (8th Cir. 2009) .............................................16

H.J. Inc. v. Northwestern Bell Tel. Co.,
    954 F.2d 485 (8th Cir. 1992) .............................................16

Hopper v. Solvay Pharmaceuticals, Inc.,
    588 F.3d 1318 (11th Cir. 2009) ..........................................6

Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,
    497 U.S. 116 (1990)..........................................................16

Papasan v. Allain,
    478 U.S. 265 (1986)..........................................................5

State ex rel. Util. Consumers' Council of Missouri, Inc. v. Pub. Serv. Comm'n,
    585 S.W.2d 41 (Mo. banc 1979)........................................... 15

United States v. Shaw,
    725 F. Supp. 896 (S.D. Miss. 1989).....................................13

U.S. ex rel. Costner v. United States,
    317 F.3d 883 (8th Cir. 2003) ..................................... 5, 6

U.S. ex rel. Graves v. ITT Educ. Services, Inc.,
    284 F. Supp. 2d 487 (S.D. Tex. 2003) ..............................6, 9, 12

U.S. ex rel. Hopper v. Anton,
    91 F.3d 1261 (9th Cir. 1996) ............................................ 7

Case 4:11-cv-00590-FJG   Document 21   Filed 05/15/12   Page 3 of 23

*U.S. ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.,*
    CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012)....................................9, 12

*U.S. ex rel. Lee v. Fairview Health Sys.,*
    CIV. 02-270 RHK/SRN, 2004 WL 1638252 (D. Minn. July 22, 2004).................9, 12, 14

*U.S. ex rel. Roop v. Hypoguard USA, Inc.,*
    559 F.3d 818 (8th Cir. 2009) ...................................................................................... 5

*U.S. ex rel. Sandager v. Dell Mktg., L.P.,*
    2012 WL 1453610 (D. Minn. Apr. 26, 2012) .................................................................5

*U.S. ex rel. Vigil v. Nelnet, Inc.,*
    639 F.3d 791 (8th Cir. 2011) ................................................................................6, 9, 13

*U.S. ex rel. Wilkins v. United Health Group, Inc.,*
    659 F.3d 295 (3d Cir. 2011)..............................................................................7, 8, 9, 13

*Young v. City of St. Charles, Mo.,*
    244 F.3d 623 (8th Cir. 2001) ....................................................................................5

**Statutes**

10 U.S.C. § 2306a ...........................................................................................................13

18 U.S.C. 201(b) .............................................................................................................13

31 U.S.C. § 1352.......................................................................................................11, 12

31 U.S.C. § 3729.............................................................................................................6

**Rules and Regulations**

48 C.F.R. 52.203–11(b)-(e)............................................................................................11

FAR 52.203-3 .................................................................................................................10

FAR 52.203.11.........................................................................................................11, 12

FAR 52.203.12.........................................................................................................11, 12

Fed. R. Civ. P. 9(b) .......................................................................................................14

iii

# I.    Introduction

Relator's *qui tam* complaint is fatally flawed because it assumes that customers have a right to rely and recover damages based upon utilities' promises about future electric rates.  But as Relator himself pleads, Missouri electric utilities' rates are set by the Public Service Commission ("PSC"). Under the Filed Rate Doctrine, all customer classes must pay the same rate; no customer can recover for fraud or breach of contract merely because the utility "promised" a rate that was not ultimately approved by the PSC and charged by the utility.

Relator's other allegations that certain officers of the customer in this case—the government—received improper gratuities, making it easier for them to accept Defendant's promises, do not state a claim under the False Claims Act. As a matter of law, Defendant never submitted a claim that falsely certified, expressly or impliedly, that it had not given gratuities.

Finally, although Relator's complaint fails to plead fraud with particularity as required by Rule 9(b), the Court need not reach this issue.  Under even the most generous reading, all three counts fail on the law and the Complaint must be dismissed.

# II.    Alleged Factual Background

Relator James Kraxberger's claims arise from Kansas City Power & Light Company's ("KCP&L's") contract with the Government Services Administration ("GSA") to provide energy services for the Richard Bolling Federal Building in Kansas City, Missouri. Relator alleges that GSA contacted KCP&L in 2005 for a cost estimate for an "electric chiller plant," because GSA "believed they could generate chilled water at a lower cost" than that offered by its current energy provider, Trigen-Kansas City Energy Corporation ("Trigen"). Complaint ¶¶ 17-19. Relator asserts that KCP&L "proposed an all electric building to GSA at a bundled electric rate purporting to save the government a significant amount of money on utilities." Complaint ¶ 20.

1

Relator claims that "KCP&L initially proposed the all electric rate to John Strickert, the GSA employee with authority over utilities at the Bolling Building, and then used Strickert as a conduit to market" the proposal. Complaint ¶ 21. KCP&L had "meeting after meeting proposing the all electric plan to now include electrode boilers to provide steam heat." *Id*. at ¶ 22. "At the very core of the deal for the conversion to an all-electric building was KCP&L's promise (or representation) that it would give the GSA a special electric rate that would make it possible for GSA to generate its own steam for the same or lower net cost as it could buy it from Trigen." *Id*. at ¶ 26. At KCP&L's "stock electrical rates for business customers," Relator claims the switch would have been uneconomical. *Id*. Relator claims only that the "false representations were made in documents submitted by KCP&L executives and by individual KCP&L representatives in meetings with GSA officials from 2005 to 2007." *Id*. at ¶ 56.

GSA's incumbent provider of steam and chilled water, Trigen, "protested, in October of 2006, that KCP&L could not give [GSA] the rate KCP&L was promising and explained they were regulated by the Missouri Public Service Commission. The PSC's rules and regulations made the rate GSA was promised impossible without offering the same rate to similarly situated utility customers." Complaint, ¶ 27. Relator alleges that the deal "was dependent on a rate promise that was in question" and ultimately, "Trigen's prophecy about the electric rates turned out to be correct. KCP&L could not, in fact, offer the rates it promised GSA and the GSA took no action to enforce the rate promise." *Id*. at ¶¶ 31-32.

Relator claims GSA was damaged by having to pay "approximately $80,000 per month for the last four years above the amount it would have paid for Trigen piped-in steam," and that "the loss to the government is even higher when the rates paid are compared to the rates promised." Complaint, ¶¶ 32-33; *see also* ¶¶ 54-55. Relator alleges that KCP&L's "claims for

2

payment" for "electrical service to the Bolling Federal Complex" from "2005 forward to the current date" were false in that "KCP&L charged GSA a higher rate for electrical service than it had promised to charge when it sought to have the conversion of the building to an all-electrical building awarded to it." Complaint, ¶53.a. *See also* ¶¶ 73-76 (incorporating allegations into "using false records" claim). Relator claims that the "false representation of the electrical rate was material" because it could have affected the government's decision to pay for electrical services "in that [KCP&L] promised the GSA that the savings from the reduced rate would pay for the installation of the electrode boilers." *Id*. at ¶ 54.

Finally, Relator claims that "KCP&L engaged in a pattern and practice of providing illegal economic incentives to individuals within the GSA." Complaint, ¶ 34. Relator claims that two GSA employees who were in positions of authority, Peter Castronuovo and John Strickert, received "Crown level" or "dugout" tickets, complimentary food and beverages, and access to private restrooms at a Royals game on June 17 and/or June 18, 2005. Complaint, ¶¶ 35-38. Relator also claims that Mr. Strickert attended a Chiefs game and that several GSA employees were KCP&L's guests at a golf tournament, where door prizes were given out. *Id*.

Relator claims that GSA failed to "do more investigation" into the rate issues, boilers, and costs because GSA employees received improper inducements from KCP&L. Complaint, ¶ 40. KCP&L made false express certifications, Relator claims, because "in the contract signed by KCP&L," "believed…to have been signed in 2007," KCP&L's right to proceed with contract work could have been terminated by written notice if "after notice and hearing, the agency head or a designee determines that the Contractor…offered or gave a gratuity…and intended, by the gratuity, to obtain a contract or favorable treatment under a contract." *Id*. at ¶ 49 (citing FAR 52.203.3). The contract also provided for the contractor to make a certification that "no Federal

3

appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency…in connection with the awarding of this contract." *Id*. at ¶ 50 (citing FAR 52.203.11).

Relator alleges that KCP&L's claims for payment were "false" in that "KCP&L obtained the contract, in contravention of express and/or implied warranties to the contrary, by offering gratuities, gifts, and/or bribes to GSA personnel." Complaint, ¶ 53.b. KCP&L's claims for payment were allegedly "false" because "KCP&L certified that it was and/or was legally required to be in compliance with the FAR regulations in this regard but had offered gratuities and made payments to influence the award of the contract." *Id*., ¶ 59. *See also* ¶¶ 70-72, 74-76 (incorporating allegations into "using false records" claim). This was material, Relator claims, to GSA's decision to enter into, ratify, "and/or to pay" under the contract. *Id*., ¶ 60.

Finally, Relator claims that all of the above acts were part of a conspiracy to violate the False Claims Act. Complaint, ¶¶ 78-83.

At no point does Relator identify the individuals who made or received the allegedly fraudulent promises or false claims, nor does Relator identify the date or describe the content of any particular promise or claim or group of promises or claims. Relator does not plead that any master contract between KCP&L and GSA contained false promises about future utility rates, nor does Relator plead what rate or rates KCP&L offered GSA. The only express certification pled by Relator is that KCP&L certified it was not using federal funds to influence the award of the contract, but Relator does not plead that KCP&L actually used federal funds to influence the award of the contract. Further, Relator does not plead that KCP&L's compliance with rules on gratuities using non-federal funds was an express precondition to any payment.

# III.    Argument

### a.  <u>Legal Standard</u>

"[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and [bound] to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.,* 244 F.3d 623, 627 (8th Cir. 2001) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, each claim of a complaint must include a sufficient showing that the plaintiff is "entitled to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. While facts alleged in a complaint are assumed true under Rule 12(b)(6), the allegations must go beyond mere speculation, *Twombly,* 550 U.S. at 555, and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In addition, "[a] complaint alleging violations of the False Claims Act must be pled with particularity pursuant to Rule 9(b)." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003). Complaints "must identify the who, what, where, when, and how," *id*., which requires "details" of the fraudulent acts, including "when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Roop v. Hypoguard USA, Inc.,* 559 F.3d 818, 822 (8th Cir. 2009) (citations omitted). Moreover, allegations must be based upon close, firsthand knowledge of the facts; the FCA was "'not intended to create windfalls for people with secondhand knowledge of [] wrongdoing.'" *U.S. ex rel. Sandager v. Dell Mktg., L.P*., 2012 WL 1453610 (D. Minn. Apr. 26, 2012), *quoting United States ex rel. Kinney v. Stoltz,* 327 F.3d 671, 674 (8th Cir. 2003).

### b.  <u>False Claims Act (31 U.S.C. § 3729)</u>

The FCA provides liability for any person who:

5

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).
\*\*\*

31 U.S.C. § 3729(a)(1)(A-C). To act "knowingly" requires that one have "actual knowledge" of the false information, or act in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. *Id.* at § 3729(b)(1)(A). Thus, to state a cause of action under section 3729(a)(1)(A) or section 3729(a)(1)(B), a party must show (1) the existence of a materially false claim, or a materially false record or statement related to a claim, (2) that the defendant knew the claim, record, or statement was false, and (3) that as a result of the false claim, statement, or record, the government made a payment that "it would not otherwise have made." *U.S. ex rel. Vigil v. Nelnet, Inc.,* 639 F.3d 791, 799 (8th Cir. 2011); *Hopper v. Solvay Pharmaceuticals, Inc*., 588 F.3d 1318, 1327 (11th Cir. 2009).

Importantly, "[t]he Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government."*U.S. ex rel. Graves v. ITT Educ. Services, Inc.,* 284 F. Supp. 2d 487, 495 (S.D. Tex. 2003) *aff'd,* 111 F. App'x 296 (5th Cir. 2004). Accordingly, a contract breach does not give rise to an FCA claim. *U.S. ex rel. Costner*, 317 F.3d at 888. Likewise, "[t]he FCA is not concerned with regulatory noncompliance." *U.S. ex rel. Vigil v. Nelnet, Inc*., 639 F.3d 791, 795-96 (8th Cir. 2011). Instead, the FCA serves a far narrower function: "protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money." *Id*. In the absence of a knowing, material, false statement or claim that causes the government to pay money, the FCA is not implicated:

> It is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA….**The FCA is far narrower**…. This does not mean that other types of violations of regulations, or contracts, or conditions set for the receipt of moneys, or of other federal laws and regulations are not remediable; it merely means that such are not remediable under the FCA or the citizen's suit provisions contained therein."

*U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996) (emphasis added).

As described below, the conduct alleged in Relator's complaint does not state a claim under the FCA. At best, Relator has *alleged* that KCP&L breached its contract with the GSA or perhaps violated a federal regulation or statute. But Relator has failed to allege any facts showing that KCP&L knowingly made a false claim or statement relied upon by the GSA to make a payment it would not have otherwise made. A review of the relevant contractual provisions, statutes, and regulations reveals that the allegedly "false" certifications of compliance at issue were not preconditions for payment. Likewise, the allegedly "false" pricing information submitted by KCP&L was known by the GSA and, pursuant to the Filed Rate Doctrine, cannot form the basis of a fraud claim. As a result, as a matter of law, there is no materially false statement that can give rise to a claim under the FCA. Relator's claims must be dismissed.

### c.  Counts I and II Fail As a Matter of Law

In Counts I and II of the Complaint, Relator alleges that KCP&L violated the FCA by submitting "false and fraudulent claims for payment from 2005 forward to the current date for electric service to the Bolling Federal Complex. Complaint ¶ 52. Importantly, Relator does not allege that KCP&L's submitted claims were "factually false." *See e.g. U.S. ex rel. Wilkins v. United Health Group, Inc.,* 659 F.3d 295, 305 (3d Cir. 2011) ("A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government…"). In other words, there is no allegation that the monthly claims submitted by KCP&L were inaccurate

7

or falsely represented the actual costs of the services provided. Instead, Relator alleges that KCP&L's claims were "legally false," *i.e.* the claims were false as the result of alleged misrepresentations made during contract negotiations or contained in the underlying contract. *Id*. ("a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment").

Specifically, Relator asserts that KCP&L's monthly claims were false because (1) "KCP&L obtained the contract, in contravention of express and/or implied warranties to the contrary, by offering gratuities, gifts, and/or bribes to GSA personal" and (2) the actual rates charged were "higher" than the rates "promised" by KCP&L in its offer to GSA. Complaint ¶ 53. Neither assertion states a valid claim under the FCA, however.

### 1. Certifications Were Not Materially False Because Compliance Was Not a Precondition For Payment

Liability under the FCA can be found where a claimant falsely certifies compliance with a federal regulation or statute that requires compliance as a pre-condition for payment. *U.S. ex rel. Wilkins*, 659 F.3d at 305. As the Third Circuit Court of Appeals has explained, so-called "false certification" claims can be further divided into two categories, express or implied:

> Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. There is a more expansive version of the express false certification theory called "implied false certification" liability which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment. Thus, an implied false certification theory of liability is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."
> ***
> Under an implied false certification theory, instead of looking at the defendant's representations to the Government, "*the analysis focuses on the*

8

> *underlying contracts, statutes, or regulations themselves to ascertain whether*
> *they make compliance a prerequisite to the government's payment.*"

*Id.* at 305, 313 (citations omitted) (emphasis added).

Though this Circuit has not expressly adopted the "implied false certification" theory, district courts assume its application. *See U.S. ex rel. Lee v. Fairview Health Sys.,* CIV.02-270 RHK/SRN, 2004 WL 1638252 (D. Minn. July 22, 2004); *see also U.S. ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.,* CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012) ("Although the Eighth Circuit Court of Appeals has not decided this issue, the majority of the courts of appeals that have considered whether there may be an implied false certification liability action under the FCA have recognized that this type of claim exists.").

Under both express and implied certification theories, however, courts recognize that "false certification" claims are only viable where compliance is a precondition for payment. *U.S. ex rel. Lee*, 2004 WL 1638252, *3 (implied certification claim "viable only when the underlying Federal statute or regulation provides that compliance is a condition or prerequisite to payment") (collecting cases); *U.S. ex rel. Vigil*, 639 F.3d at 799-800 (requiring regulatory compliance for "participation" in loan program insufficient to state FCA false certification claim). Stated differently, "[t]he violation of the statute or regulation does not create a cause of action under the False Claims Act; liability arises only if the defendant has made a false certification of compliance with the statute or regulation, when payment is conditioned on that certification." *U.S. ex rel. Graves*, 284 F. Supp. 2d at 497. Absent this limitation, "the FCA could turn into a blunt instrument to enforce compliance with all ... regulations rather than only those regulations that are a precondition to payment. *U.S ex rel. Wilkins*, 659 F.3d at 307 (citations omitted).

Here, Relator has failed to plead that KCP&L falsely certified compliance with any federal statute or regulation requiring compliance in order to obtain payment from the

government. Notably, Relator does not allege that the monthly bills submitted by KCP&L to the GSA for payment—the relevant "claims" for purposes of the FCA—contained express certifications by KCP&L of compliance with any statute or regulation. Instead, Relator alleges that two "certifications" contained in KCP&L's contract with the GSA were false, Complaint ¶¶ 49-50, and that the contract was "obtained" in violation of two federal laws. Complaint ¶ 66. As such, Relator attempts to fit his claims into the "implied false certification" category. Regardless of the specific variety of his claims, however, Relator has failed to show the existence of a materially false statement giving rise to liability under the FCA.

### a. FAR 52.203-3

Relator asserts that "the contract signed by KCP&L" included the clause set out in FAR 52.203-3 relating to gratuities. Complaint ¶ 49. FAR 52.203-3, however, does not contain any certification on the part of KCP&L. Nor does Relator allege that KCP&L "certified compliance" with that clause. The plain language of FAR 52.203-3 reveals that it is completely inapposite to Relator's claims. It merely provides that the contract "may be terminated" in the event that, "after notice and hearing" it is determined that the contractor provided a gratuity or gift to a government official intended to "obtain a contract or favorable treatment under a contract." FAR 52.203-3. This clause does not certify, or otherwise require KCP&L to certify, that it has not provided gratuities to governmental officials. Instead, it merely provides that the "right of the contractor to proceed may be terminated" by the agency if it is ultimately determined that such gratuities were provided. Simply put, there is no "express and/or implied warranty" or certification contained in FAR 52.203-3, let alone a clause conditioning payment from the government on compliance with a federal law.

## b. FAR 52.203.11

Relator also alleges that KCP&L's contract with GSA contained the certification

provided for by FAR 52.203.11, which states, in relevant part:

> (b) Prohibition. The prohibition and exceptions contained in the FAR clause of
> this solicitation entitled "Limitation on Payments to Influence Certain Federal
> Transactions" (52.203–12) are hereby incorporated by reference in this
> provision.
> (c) *Certification*. The offeror, by signing its offer, hereby certifies to the best of
> its knowledge and belief that *no Federal appropriated funds have been paid or
> will be paid to any person for influencing or attempting to influence an officer
> or employee of any agency*, a Member of Congress, an officer or employee of
> Congress, or an employee of a Member of Congress on its behalf in connection
> with the awarding of this contract.
> (d) Disclosure. If any registrants under the Lobbying Disclosure Act of 1995
> have made a lobbying contact on behalf of the offeror with respect to this
> contract, the offeror shall complete and submit, with its offer, OMB Standard
> Form LLL, Disclosure of Lobbying Activities, to provide the name of the
> registrants. The offeror need not report regularly employed officers or
> employees of the offeror to whom payments of reasonable compensation were
> made.
> (e) Penalty. Submission of this certification and disclosure is a *prerequisite for
> making or entering into this contract imposed by 31 U.S.C. 1352*. Any person
> who makes an expenditure prohibited under this provision or who fails to file
> or amend the disclosure required to be filed or amended by this provision, shall
> be subject to a civil penalty of not less than $10,000, and not more than
> $100,000, for each such failure.

48 C.F.R. 52.203–11(b)-(e). Again, however, the regulation cited by Relator provides no basis

for a false certification claim under the FCA.

First, Relator has failed to allege any facts suggesting that KCP&L has failed to comply

with the regulation at issue. FAR 52.203.11 is aimed at enforcing the Byrd Amendment, 31

U.S.C. § 1352, which prohibits the recipient of federally "appropriated funds" from using such

funds to pay for lobbying expenses related to procuring a federal contract, grant, or loan. FAR

52.203.12. Notably, federally appropriated funds "does not include profit or fee from" a

government contract, and "[t]o the extent the Contractor can demonstrate that the Contractor has

sufficient monies, other than Federal appropriated funds, the Government will assume that these other monies were spent for any influencing activities that would be unallowable if paid for with Federal appropriated funds." FAR 52.203.12(b)(1)-(2). By signing the certification set out in FAR 52.203.11, KCP&L was not certifying that it had not spent any funds to influence "an officer or employee of any agency," but rather, that it had not spent any "*Federal appropriated funds*" for such purposes. FAR 52.203.11 (emphasis added). Relator has made no allegation that the alleged "gratuities" provided by KCP&L consisted of federally appropriated funds. Accordingly, Relator's claim that KCP&L falsely certified compliance with FAR 52.203.11 fails as a matter of law. *U.S. ex rel. Lee*, 2004 WL 1638252 (dismissal of "implied false certification" claim appropriate where alleged facts failed to show that underlying law was violated).

Second, even if Relator had alleged that KCP&L failed to comply with the certification contained in FAR 52.203.11 (which he has not), there is nothing contained in that certification or the underlying regulation (52.203.12) and statute (31 U.S.C. § 1352) making compliance a prerequisite to obtaining payment. To the contrary, the certification states that it is a "prerequisite for making or entering into th[e] contract." FAR 52.203.11(e). But prerequisites to entering into a contract or participating in a government program are distinguishable from laws requiring compliance *to obtain payment*. False certification claims only arise from the latter. *U.S. ex rel. Kappenman*, 2012 WL 602315 ("Conditions of participation claims are not actionable FCA claims and "are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program") (citations omitted); *U.S. ex rel. Graves*, 284 F. Supp. 2d at 501 (courts have "recognized a distinction between generally certifying compliance with applicable regulations and statutes governing participation in a program, as opposed to certifying compliance with a particular requirement that is a prerequisite

12

to receiving or retaining payment under that program…liability for false certification under the False Claims Act [may] arise only when the government has conditioned payment of a claim on the certification of compliance.").

Simply put, payment from the GSA was not conditioned on KCP&L's compliance with FAR 52.203.11 and FAR 52.203.12, and KCP&L's alleged failure to comply with these regulations cannot form the basis of a claim under the FCA.

### c.   18 U.S.C. § 201 and 10 U.S.C. § 2306

Finally, Relator alleges that KCP&L's "contract was obtained in violation of 18 U.S.C. § 201(b) and 10 U.S.C. § 2306a." Complaint ¶ 66. 18 U.S.C. 201(b) prohibits bribery of public officials and witnesses and 10 U.S.C. § 2306a requires that the offeror of a federal contract submit certain "cost and pricing data before the award" of the contract. Relator does not allege that KCP&L certified compliance with these provisions in the contract or in any claim for payment submitted to the GSA. Likewise, neither statute conditions payment from the government with compliance. Thus, boiled down to its core, Relator's assertion is simply this: because KCP&L allegedly violated these federal laws, any claims submitted to the GSA for payment violated the FCA. Relator attempts to employ the FCA as a "blunt instrument to enforce compliance" with all federal statutes and regulations. *U.S ex rel. Wilkins*, 659 F.3d at 307 (citations and quotations omitted). The Eighth Circuit has warned against such overreaching applications of the FCA. *U.S. ex rel. Vigil,* 639 F.3d at 795-96 ("The FCA is not concerned with regulatory noncompliance"). Merely alleging violations of federal law does not create FCA claims. *Id. See also United States v. Shaw*, 725 F. Supp. 896, 900 (S.D. Miss. 1989) ("The bare fact that bribes were involved in this case, a fact established conclusively by the prior criminal proceeding, does not necessarily lead to the further conclusion that false or fraudulent claims

were made in connection with each of the loan applications or preapplications."). Because neither 18 U.S.C. § 201(b) nor 10 U.S.C. § 2306a make "compliance… a condition or prerequisite to payment," Relator's claim fails on the law. *U.S. ex rel. Lee*, 2004 WL 1638252.

### 2. Relator's Fraudulent Inducement Claim Fails Because the Filed Rate Doctrine Does Not Allow GSA to Enforce Alleged "Low Rate" Promises or Recover Fraud Damages Due to Alleged Reliance on a Rate Lower than the Filed Rate

Relator's pleading of fraudulent inducement is too vague to satisfy FRCP 9(b), but this Court need not reach the Rule 9 issue because even under the most generous and imaginative reading of Relator's murky allegations, the Filed Rate Doctrine bars Relator's claim.

The heart of Relator's complaint is his theory that GSA is now paying $80,000 extra per month because it locked itself into an "all electric" arrangement for using KCP&L for all of its heating and chilling needs, rather than an alternative supplier of steam and chilled water, Trigen. Complaint, ¶¶ 26-33. Relator alleges that GSA failed to heed warnings (from Trigen, and possibly from others) that regulators who set KCP&L's rates would not allow KCP&L to supply power at the low rates allegedly needed to make GSA's investment in a new electricity-powered steam generation system pay for itself. *See* Complaint, ¶ 27. Although Relator utterly fails to plead the who, when, and what of KCP&L's alleged inducement regarding rates, Relator's theory rests on the idea that by promising low rates that never materialized, KCP&L fraudulently induced GSA to agree to use KCP&L's electricity for on-site heating and cooling. Relator's stylistic argument heading proclaims that this is the "core material misrepresentation," and Relator pleads that the misrepresentation was at the "core of the deal" for GSA to convert to an all-electric building. Complaint, p.7, ¶ 26.

14

The kernel of truth in Relator's theory is enough to defeat it, regardless of the particulars

Relator might have pled had he complied with FRCP 9(b). As Trigen itself allegedly told GSA,

KCP&L is a public electric utility:

> 27. Trigen protested, in October of 2006, that KCP&L could not give the
> GSA/PBS the rate KCP&L was promising and explained they were regulated by
> the Missouri Public Service Commission. The PSC's rules and regulations made
> the rate GSA was promised impossible without offering the same rate to similarly
> situated utility customers.
>
> 32. Trigen's prophecy about the electric rates turned out to be correct. KCP&L
> could not, in fact, offer the rates it promised the GSA and the GSA took no action
> to enforce the rate promise…

Complaint, ¶¶ 27, 32. Trigen was correct that KCP&L's Missouri rates are set by Missouri

regulators, the Public Service Commission ("PSC"). Under Missouri law, KCP&L cannot

charge a rate other than the rates set by the PSC and published in its tariff, or rate schedule:

> As is apparent from the above summary of the relevant statutes, in order to carry
> out its statutory duties and effectuate the legislative policy objectives embodied
> therein, the commission must supervise, regulate and control the public utilities
> within its jurisdiction… It can do so, under the statutes, either by "approval of rate
> schedules filed with it or by order after investigation or hearing." The ultimate
> purpose of such action is to fix a rate which is just and reasonable both to the
> utility and to its customers. The lawful rate is that fixed by the commission, See ss
> 393.270(2), (3), which rate has the same force and effect as if set by the
> legislature…

*State ex rel. Util. Consumers' Council of Missouri, Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41,

48-49 (Mo. banc 1979) (internal citations omitted).

Missouri's courts have long followed their federal counterparts in applying an important

corollary to the lawful setting of "filed rates." *See Bauer v. Southwestern Bell Tel. Co.,* 958

S.W.2d 568, 570 (Mo. App. E.D. 1997) ("The filed tariff, or filed rate, doctrine governs a

utility's relationship with its customers and provides that any rate filed with the appropriate

regulatory agency is sanctioned by the government and cannot be the subject of legal action");

*Crumley v. Time Warner Cable, Inc*., 556 F.3d 879 (8th Cir. 2009) ("The filed rate doctrine also applies to rates filed with state agencies.").

The Filed Rate Doctrine instructs courts not to entertain suits for damages for breach of contract, fraudulent inducement, or any other cause of action based on the theory that a customer should have received a "promised" rate or services different from those approved by regulators. *Bauer*, 958 S.W.2d at 570 ("a customer of a utility has no cause of action against a utility for alleged negligent or intentional misquotation of a tariffed service."). "[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998). Neither misquotation nor ignorance of the filed rate prevents its enforcement. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 120 (1990). Courts do not aid customers who bought services relying on false promises of low rates because the enforcement of uniform rates trumps individual causes of action:

> While the filed rate doctrine may seem harsh in some circumstances… its strict application is necessary to "prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts," the very evil the filing requirement seeks to prevent. Regardless of the carrier's motive-whether it seeks to benefit or harm a particular customer-the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services. It is that antidiscriminatory policy which lies at "the heart of the common-carrier section of the Communications Act.

*AT&T*, 524 U.S. at 223 (internal citations omitted). *See also H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992) (applying doctrine to dismiss RICO claim even where a utility allegedly committed fraud against the rate-setting agency).

Every customer is charged with knowledge of the filed rates set by the regulator (here, the PSC), and no utility, customer, or court has the power to alter the arrangement, whether prospectively or retrospectively through an award of damages. *See Firstcom, Inc. v. Qwest*

*Corp.*, 555 F.3d 669, 680-681 (8th Cir. 2009) (in dismissing promissory estoppel and fraud claims, stating that "to the extent Firstcom seeks recovery for a price discount it was allegedly entitled to, its claims are barred by the filed rate doctrine," and the "doctrine similarly bars Firstcom's claims insofar as they allege that Qwest should have provided additional telecommunications services not covered by the interconnection agreements").

The same rule applies here—both by law and by *Relator's own pleading*. Indeed, even if the Filed Rate Doctrine did not absolutely bar fraud claims, Relator has pled himself out of the reliance element of fraud by admitting that GSA was actually aware of the fact that KCP&L is a regulated entity that must have its rates approved by the PSC. Complaint, ¶¶ 27, 32. This should not be shocking, because "similar to laws, all Missouri citizens are presumed to know the filed tariffs." *Bauer*, 958 S.W.3d at 570. Accordingly, GSA was not entitled to rely upon any promised rates from KCP&L, and has no cause of action to recover damages measured by the difference in the rates it wanted to have received and the rates it actually did receive. GSA certainly has no claim for damages that are even more remote, such as sums GSA spent in the belief that the rates promised by KCP&L (whatever they were) would be so low that a variety of other investments would essentially be "paid for." *See Crumley*, 556 F.3d at 881 (regardless of how plaintiff characterizes fraud claims, an attempt to recover damages for the utility's collection of fees that are part of the filed rate is barred by the filed rate doctrine).

The Filed Rate Doctrine, therefore, dooms Relator's main claim. GSA never had, and does not now have, a right to conduct its affairs or pay for electricity based on rate schedules it hoped would be implemented (even if they were promised by KCP&L), but which were never approved by the PSC. Those parts of Counts I, II, and III based on a fraudulent promise that electricity rates would be below a certain amount must be dismissed for failure to state a claim.

17

### d. Count III Fails As a Matter of Law

Count III alleges a "conspiracy" to commit the acts alleged in Counts I and II.  Because, as discussed above, those claims fail, Count III fails as well.

### IV. Conclusion

For the foregoing reasons, the complaint should be dismissed for failure to state a claim.


Respectfully submitted,

**GRAVES BARTLE MARCUS & GARRETT LLC**

/s/Todd P. Graves
Todd P. Graves, Mo. Bar No. 41319
Edward D. Greim, Mo. Bar No. 54034
Clayton J. Callen, Mo. Bar No. 59885
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Telephone: (816) 256-4144
Facsimile: (816) 817-0863
edgreim@gbmglaw.com


*Counsel for Defendant KCP&L*

18

## CERTIFICATE OF SERVICE

       This is to certify that a true and correct copy of the above and foregoing instrument to which this certificate is attached was filed by ECF on May 15, 2012, effecting service on:

Edward D. Robertson, Jr.
Anthony L. DeWitt
BARTIMUS, FRICKLETON,
  ROBERTSON & GORNY, P.C.
715 Swifts Highway
Jefferson City, MO 65109
aldewitt@sprintmail.com
chiprob@earthlink.net

Jeffrey J. Carey
CAREY LAW FIRM, LLC
229 SE Douglas St., Suite 210
Lee's Summit, MO 64063
carey@carey-lawfirm.com

*Counsel for Relator*

**Jenelle M. Beavers**
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington D.C. 20530

Thomas M. Larson
United States Attorney
400 E. 9th Street, Suite 5510
Kansas City, MO 64105
(816)426-3130
(816) 426-3165 (fax)
tom.larson@usdoj.gov

  /s/Todd P. Graves
Todd P. Graves
*Counsel for Defendant KCP&L*

19