# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **UNITED STATES ex rel. JAMES KRAXBERGER**, | ) ) ) | |
| Relator/Qui Tam Plaintiff, | ) ) | Case. No. 11-CV-0590-W-FJG |
| v. | ) ) | |
| **KANSAS CITY POWER & LIGHT CO.**, | ) ) ) | |
| Defendant. | ) | |

### DEFENDANT'S MEMORANDUM IN SUPPORT
### OF ITS MOTION TO DISMISS RELATOR'S "FALSE RATE PROMISE" THEORY

June 20, 2013

Respectfully submitted by:

**GRAVES BARTLE MARCUS
& GARRETT, LLC**

Todd P. Graves, Mo. Bar No. 41319
Edward D. Greim, Mo. Bar No. 54034
Clayton J. Callen, Mo. Bar No. 59885
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
(816) 256-3181 (telephone)
(816) 256-5958 (facsimile)

COUNSEL FOR DEFENDANT KANSAS
CITY POWER & LIGHT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND............................................................................................... 2

    Relator's Information.................................................................................................. 3

    GSA's Publicly Disclosed Information: FOIA Response 07-005 ........................................ 5

ARGUMENT........................................................................................................................ 9

    I.      GSA's Prior FOIA Report Is a Public Disclosure

           Under the False Claims Act....................................................................... 9

    II.     Relator Cannot Meet His Burden of Proving

           He Is an Original Source ......................................................................... 13

Conclusion .......................................................................................................................... 14

# Table of Authorities

*Cases*

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,

    276 F.3d 1032 (8th Cir. 2002) ....................................................................................... 12

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,

    131 S.Ct. 1885 L.Ed.2d 825 (2011) ................................................................... 10, 11, 12

*U.S. ex rel. Kinney v. Stoltz*,

    327 F.3d 671 (8th Cir. 2003) ......................................................................................... 14

*U.S. ex rel. Oliver v. Philip Morris USA Inc.*,

    -- F.Supp.2d -- 2013 WL 2637032 *6-7 (D. D.C. June 13, 2013) ............................ 12, 13

*U.S. ex rel. Paulos v. Stryker Corp.*,

    2013 WL 2666346 *2 (W.D. Mo. June 12, 2013) ..................................................... 10, 12

*U.S. ex rel. Rabushka v. Crane Co.*,

    40 F.3d 1509 (8th Cir. 1994) ......................................................................................... 12

*U.S. ex rel. Settlemire v. Dist. of Columbia*,

    198 F.3d 913 (D.C. Cir. 1999) ....................................................................................... 13

**Statutes**

31 U.S.C. § 3730 ................................................................................................................. 1, 10, 13

**Rules**

Fed. R. Civ. P. 12 .......................................................................................................................9, 10

# INTRODUCTION

Under the False Claims Act, this Court lacks jurisdiction over Relator's main claim because GSA had already publicly disclosed the underlying "transactions." Relator claims that KCP&L promised or guaranteed the "all-electric rate" to GSA, but that this was knowingly false because, in fact, the rate's applicability was subject to the MPSC's rate decisions. Relator based his "rate promise" claim on four documents he received from his father. Each document was an effort by Trigen, KCP&L's competitor, to convince GSA not to undertake the all-electric conversion project. In his Complaint, Relator called the longest and most detailed letter, sent by Trigen to GSA on October 4, 2006, a "prophecy" that the MPSC would not allow KCP&L to make the rates available, notwithstanding KCP&L's promises, and that GSA would end up paying more to heat the building if it switched to the all-electric system KCP&L was proposing. This letter was circulated widely within GSA, and Relator was far from the first member of the public to review it. As it turns out, GSA had disclosed all of these documents—and much more—in a written response to a 2006 Freedom of Information Act ("FOIA") request. FOIA responses qualify as a "Federal report" under the FCA's jurisdictional bar. Accordingly, because "substantially the same allegations or transactions…were publicly disclosed in a…Federal report," "the court shall dismiss" Relator's claim. *See* 31 U.S.C. § 3730(e)(4)(A).

Relator can avoid this jurisdictional bar only if he was an "original source" of the information, which means that he must have (1) disclosed this same information to the government *before* GSA made its public disclosure (*i.e.*, its FOIA response); or (2) have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and have provided it to the government before filing his claim. Because Relator admits that neither prong applies, his "false rate promise" claim must be dismissed.

1

# FACTUAL BACKGROUND

Relator's First Amended Complaint was filed April 19, 2012 (Doc. 10). Relator pleaded that there was a "CORE MATERIAL MISREPRESENTATION REAGRDING ELECTRIC RATES." *Id*. at p. 7. Relator's primary facts regarding that misrepresentation are as follows:

> 26. At the very core of the deal for the conversion to an all-electric building was KCP&L's promise (or representation) that it would give the GSA a special electric rate that would make it possible for GSA to generate its own steam for the same or lower net cost as it could buy it from Trigen. Had KCP&L asked to have the project approved at its stock electrical rates for business customers, the rates would have made the electrode boilers too costly to operate, and all of the economic incentive for the government to switch to all electric would have vanished.
>
> 27. Trigen protested, in October of 2006, that KCP&L could not give the GSA/PBS the rate KCP&L was promising and explained they were regulated by the Missouri Public Service Commission. The PSC's rules and regulations made the rate GSA was promised impossible without offering the same rate to similarly situated utility customers.
>
> 32. Trigen's prophecy about the electric rates turned out to be correct. KCP&L could not, in fact, offer the rates it promised the GSA and the GSA took no action to enforce the rate promise. The result is that the government has paid approximately $80,000 per month for the last four years above the amount it would have paid for Trigen piped-in steam.
>
> 53. The claims were false in that:
> > a. KCP&L charged GSA a higher rate for electrical service than it had promised to charge when it sought to have the conversion of the building to an all-electric building awarded to it.
>
> 54. The false representation of the electrical rate was material in that it had the capacity to affect the government's payment decision in that it promised the GSA that the savings from the reduced rate would pay for the installation of the electrode boilers.
>
> 64. The representations were made knowingly in that KCP&L had no intention of ever giving the GSA lower rates or, in the alternative, were made with reckless disregard for the actual ability to offer the lower rates.
>
> 73. Defendant made false records in that it submitted documents showing it would offer a lower rate when it knew or in the exercise of reasonable diligence should have known that it could not charge that rate.

Relator's First Amended Complaint (Doc. 10).

**Relator's Information**

In discovery, Relator produced only four documents, comprising a total of 17 pages, relating to what he called the "core misrepresentation".[1] At deposition, Relator could not remember having reviewed all 17 pages, but testified that he received them from his father, Michael Kraxberger, after his retirement from GSA. Ex. A, *Deposition of James Kraxberger*, 16:25-19:15; 24:20-26:24; 27:4-17 (identifying Kraxberger exhibits 301-304).

The second document, an October 4, 2006, letter from Trigen to GSA, states:

> One final point. You asserted that the rationale for your GSA colleagues going with electric resistance heating was to a great degree decided by "packaged" savings offered by KCPL, and in some manner, through its contractors.
>
> I should point out that KCPL, like Trigen-Kansas City, is subject to regulation by the Missouri Public Service Commission (PSC). All rates and tariffs offered to any customer must be published and themselves made available to all similarly-situated customers.
>
> Trigen's costs for service that we presented to GSA were arrived at by application of our published tariffs, as escalated by projected rate increases. There was no "packaging", with or without chilled water, for example, involved in our steam rates. Our individual proposals for heating and cooling energy services do not depend on the selection of both. Continuing Trigen steam service to you was offered to you (and remains offered) at standard tariff rates, without any bundling or packaging of discounts, incentives, equipment or additional services.
>
> We feel Trigen demonstrated clearly that GSA would realize significant savings for heating by choosing Trigen, when compared against published KCPL tariff rates for equivalent service, that were also escalated for projected rate increases. To the extent KCPL's "packaged" pricing deviates (if at all) from KCPL's published tariff rules and regulations, such a deal would have to comply with PSC regulations. KCPL will also need to demonstrate that its offer complies with fair competitive and promotional practice requirements. And if in fact their "packaged" proposal is compliant, KCPL must further make such "packaged" deals equally and universally available to all similarly-situated customers.

*See* Ex. B hereto (J. Kraxberger Ex. 304).

---

[1] The only other documents Relator produced were articles of incorporation and an annual filing for one subcontractor on the conversion project, and a photocopy of a baseball ticket stub.

Relator admitted at deposition that this letter was the "prophecy" from Trigen that he referenced in his Complaint, which, in his mind, "spelled out to GSA they weren't going to get a special electric rate." Ex. A 71:13-23. Further, this was the letter that served as the basis for paragraph 27 of the Complaint. Ex. A 58:6-59:14. The only other information in paragraph 27 allegedly came from Pete Castronuovo, who told Relator sometime after the boilers were installed that Castronuovo had heard that the reason KCP&L could not offer the all-electric rate to the GSA was that "KCP&L could not offer the rate to everybody else." Ex. A 60:6-61:24.

After receiving October, 2006 Trigen letter from his father, Relator performed no analysis or investigation. Ex. A 27:11-17. Relator did not share the document with the government. Ex. A 31:2-20. Relator testified that his only other knowledge about the availability of the rate before the boilers came online was from conversations he overheard between Castronuovo and Steve Marchand, Relator's supervisor at Cimarron Electric, who were allowed to sit in on some conversion project meetings with KCP&L. Ex. A 69:8-70:6. Relator himself was not at the meetings; he merely overheard conversations *about* the meetings from two workers who had been allowed to listen in. *Id*. Finally, other than the packet he received from his father, Relator received no other written materials before filing the lawsuit. Ex. A 141:11-16. Relator never saw any documents in which KCP&L made an express promise to GSA that "a certain rate would be offered and available to GSA." Ex. A 133:7-22. Indeed, Relator has "never been around any KCP&L employees during a meeting, so I could not have hard them say anything." Ex. A 46:4-11; Ex. A 39:25-40:5. Accordingly, Relator's non-documentary information about KCP&L's allegedly "knowingly false" statements about the all-electric rate comes exclusively from overhearing comments made by GSA workers who, in turn, heard comments made by KCP&L in other meetings that Relator did not attend.

4

**GSA's Publicly Disclosed Information: FOIA Response 07-005**

On October 26, 2006, Lathrop & Gage, LLC, sent a FOIA request to GSA for

• All documents relating to any bid, proposal and/or offer by Kansas City Power & Light a/kla Great Plains Energy, and/or any of their subcontractors (collectively, "KCPL"), to provide utilities, products and/or services (collectively, "Services") to GSA at the Boiling Federal Building which were received by GSA in the last three years; and

• All contracts, term sheets, letters of intent, memoranda of understanding and/or agreements entered into between GSA and KCPL (or any of its subcontractors) related to the provision of Services by KCPL at the Belling Federal Building in the last three years.

*See* Ex. C hereto (Affidavit of Clayton Callen authenticating GSA's letter and documents responding to his request for prior FOIA requests and responses relating to Bolling Building bids); Ex. D hereto (GSA's March 5, 2013, letter to Clayton Callen enclosing complete copy of GSA FOIA 07-005, including Lathrop's request and GSA's reports in response thereto); Ex. E hereto (Lathrop & Gage request).

The GSA labeled Lathrop's request as FOIA 07-005 and, on October 26, 2007, and November 27, 2007, responded with two reports attaching its responsive documents. *See* Ex. F (October 26, 2007 report) and Ex. G (November 27, 2007 report). In fact, GSA reviewed and "produced again" these same documents in discovery in the instant case. Ex. O, *3-25-13 Deposition of Joshua Trader* 31:21-32:12. These were business records of the GSA. *See* Ex. P (business records affidavit accompanying production in discovery of many of the same documents produced by GSA in its FOIA request).

*The October 4, 2006 Trigen Letter*

Among the documents GSA produced to Lathrop & Gage in its 07-005 FOIA report was the October 4, 2006 letter of Trigen Vice President and General Manager Brian Kirk to Mike Kraxberger of the GSA. *See* Ex. H hereto (GSA's FOIA-produced letter). It is another copy of

5

the same letter Mike Kraxberger gave to his son, the Relator, several years later, and which supported the core of the Relator's Complaint. *Compare* Ex. B (Relator's document).

*February 21, 2006 Email Chain Regarding All-Electric Rate Savings*

The GSA produced many other documents to Lathrop & Gage that were produced years later in discovery in Relator's case. For example, it contains a February 21, 2006 email chain evidencing (1) KCP&L's use of the all-electric rate in its estimates; (2) Trigen's response; and (3) internal GSA discussion regarding KCP&L's rate structure and the savings that might accrue to GSA from the all-electric rate. *See* Ex. I hereto.

The document begins with a Trigen's February 21, 2006 electronic mail to Michael Kraxberger, suggesting that even if KCP&L could not offer its all-electric rate, KCP&L's LGS or LPS rates might apply to GSA's non-heating loads and then be combined with existing Trigen steam to offer superior savings. In responsive emails, GSA officials discuss KCP&L's rate structure and the applicability of the all-electric rate. Specifically, Gene Ramirez, a GSA Facility Engineer, responded to questions by then-Project Manager Jay Fine and Michael Kraxberger by explaining how KCP&L's rate proposals differed from the Bolling Building's historical usage: "All-electric is covered by schedule LGA rates. Bolling historical use has been 1PGSF which is LPS rates. The proposed rate schedule for all-electric cost savings is 1LGAF… There is no mention of the all-electric rate in the Executive Summary but this rate was used in the Cost Analysis Summary." *See* Ex. I p.1. Ramirez then attaches KCP&L's pricing brochures and its official Schedule of Rates (i.e., all of its tariffs, including its all-electric tariffs) for Missouri. *Id*.

Further, he points out that "Alternate #5" (this was the all-electric option that GSA selected) of KCP&L's proposal "shows a comparison cost between rate schedules 1PGSF and

6

1LGAF with 1LGAF showing the grater cost savings." *Id.* (under letter "G"). Under letter "H," Ramirez also indicates that KCP&L's proposal had shown an Alternative 5 savings ("A5Savings") under the regular (1PGSF) rate of $550,337, and under the all-electric (1LGAF) rate of $688,263. Further, he indicated that "in the updated Cost Analysis summary, A5Savings (1LGAF) were $739,944." *Id.* Finally, under "I," Ramirez explained to his GSA colleagues the MPSC's (*i.e.*, the tariff's) physical requirements for receiving the all-electric rate.

*February 21, 2006 Letter of Jan Bramel Regarding Qualification for the All-Electric Rate*

Finally, numerous other documents make clear that KCP&L's proposals to GSA used the all-electric rate. For example, on February 21, 2006, Jan Bramel of KCP&L emailed GSA Project Manager Jay Fine that "The proposal presented to you for the Bolling Federal Building takes into account all rate classes you would qualify for in order for the Federal Building to be on the best rate available. LGS (Large General Service), LPS (Large Power Service), and LGA (All Electric) were considered. According to our proposed rate structure, as long as the primary source of heating and cooling in a building is electric, the customer would qualify for the All Electric Rate." *See* Ex. J hereto.

*June 2005 and February 2006 Proposals Showing the All-Electric Rate Savings*

Further, the June 21, 2005 and January/February 2006 proposals are included in the FOIA response, and the Comparative Energy/Cost Analysis Summary, which indicates that the all-electric option saves the most money, clearly indicates that the "All Electric Primary" rate is being used. *See* Ex. K hereto, pages 97-147.

*September 27, 2005 Bramel Letter Regarding Reduced Costs from the All-Electric Rate*

Additionally, GSA produced a September 27, 2005 letter to Mike Kraxberger from Jan Bramel. *See* Ex. L. The one-page letter states, in relevant part, "The current proposal before

7

you represents in our opinion the best energy solution for the project. This proposal provides GSA low construction costs and reduced operating costs from more efficient HVAC equipment and the KCP&L all-electric rate schedule." *Id.*

*July 31, 2006 GSA Memorandum Explaining Study and Choice of All-Electric Option*

GSA produced a July 31, 2006 memorandum which summarized the project as follows: "This project stated with a feasibility study to replace the existing Trigen district chilled water and steam supply loops with building chilled water and steam plants. Through the feasibility study, new building plants were determined to be the most economical choice with a significant savings seen over a 20 year span. Building plants also offer improved capacity and reliability. In a follow-up effort, KCPL developed an initial proposal. As part of the IP, KCP&L presented various options to employ with initial cost estimates and life cycle cost analysis for each option. Option #5 [the all-electric option] was chosen, a chiller plant and boiler plant employing electric steam boilers." *See* Ex. M.

*Sworn Report of Joshua Trader Regarding GSA Reliance on All-Electric Rate*

Finally, a search of the internet reveals the publicly-disclosed and sworn report of Joshua Trader, Project Manager for the conversion, "to describe the impact on my agency [GSA] of the Commission's decision to limit the availability of KCPL's general service all-electric tariffs and separately-metered space heating rates ("All-Electric/Space-Heating Rates") to those customers receiving service under that rate as of January 1, 2008." *See* Ex. N, p. 3 (also available online, https://www.efis.psc.mo.gov/mpsc/commoncomponents/viewdocument.asp?DocId=510648324 and at https://www.efis.psc.mo.gov/mpsc/commoncomponents/viewdocument.asp?DocId=510253456). Trader discloses that GSA was not receiving service under the rate on January 1, 2008, that absent the Commission's decision, GSA would have qualified for the rates, and that "GSA made

8

financial decisions based on our qualification for KCPL's All-Electric/Space-Heating Rates." *Id*. at 4. Further, Trader outlined the financial impact of losing the rate: "GSA expected to realize approximately $85,000 annually in utility costs savings from the all-electric/space-heating rate. The life-cycle-cost-analysis performed as part GSA's financial decision making process used the all- electric/space-heating rate as input as this rate effectively reduced the cost per kilowatt hour for electricity. The revocation of the rate has negatively affected the projected costs savings as well as the life-cycle-cost of the project and altered information upon which financial decisions were made at the development stage." *Id*.

Relator filed his initial Complaint on June 9, 2011 (Doc. 1). He alleges that "before filing suit," "information was provided to the government." *See* Complaint, Paragraph 6. Despite this disclosure, Relator's counsel refused to allow Relator to identify the information Relator provided to the government, erroneously asserting "work product, attorney/client privilege. Don't answer." Ex. A 33:20-34:16. Relator suggested that he "assume[d]" that the information he provided to the government was the packet he received from his father. *Id*. Again, this packet included the Trigen letter that formed the basis of Relator's "all-electric" allegations, and that GSA had already produced to Lathrop & Gage in its FOIA response.

## ARGUMENT

### I. GSA's Prior FOIA Report Is a Public Disclosure Under the False Claims Act

Under the False Claims Act, the government's public disclosures of "substantially the same allegations or transactions as alleged in the action or claim" require that the district court "shall dismiss" the "action or claim."[2] The Act provides, in relevant part:

---

[2] The FCA's disclosure bar is jurisdictional; "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). In the alternative, even if the bar is not jurisdictional, it goes to the failure to state a claim, which "may

9

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Government Accountability Office, **or other Federal report, hearing, audit, or investigation**; or
> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4) (emphasis added).[3] The word, "report," is given its "ordinary meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011). It therefore means "something that gives information" or a "notification;" "an official or formal statement of facts or proceedings;" "an account brought by one person to another;" "an account or announcement that is prepared, presented, or delivered, usually in formal or organized form;" or "an account or statement describing in detail an event, situation, or the like." *Id.* (collecting ordinary definitions of "report"). "The other sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides a 'broad sweep.'" *Id.*

Accordingly, "[a] written agency response to a FOIA request falls within the ordinary meaning of report." *Schindler*, 131 S.Ct. at 1893. "If an allegation or transaction is disclosed in

---

be raised" by a Rule 12(c) motion or at trial. Rule 12(h)(2). KCP&L raises the issue now because, in addition to its summary judgment arguments, it may obviate the need for trial.

[3] KCP&L cites the post-2010 version of the FCA's Public Disclosure Bar, even though the prior version, which contained an even broader bar, arguably applied to the vast majority of Relator's claimed "false statements." *See U.S. ex rel. Paulos v. Stryker Corp.*, 2013 WL 2666346 *2 (W.D. Mo. June 12, 2013) (decision by Judge Ortrie Smith dismissing claims for wrongful conduct that allegedly began in 2005 and then continued for some period after 2010).

10

a record attached to a FOIA response, it is disclosed 'in' that FOIA response and, therefore, disclosed 'in' a report for the purposes of the public disclosure bar." *Id*. (finding that Labor Department's FOIA production of certain forms filed by the Schindler company was a "report" for purposes of the public disclosure bar, where the relator's case was based on a claim that Schindler failed to file forms or included false information in some forms).

As shown above, the core document upon which Relator based the allegations in his Complaint that KCP&L made a knowingly false promise about the all-electric rate—the "Trigen prophecy" letter—was disclosed by GSA in response to a 2006 FOIA request. Other documents produced by GSA in its FOIA response further demonstrated the two main elements of Relator's "fraud" claim: (1) that KCP&L falsely "promised" the all-electric rate by using it in its proposals for the building (and by the other communications referenced above); and (2) that this was material to the GSA's decision. In fact, the materials show *the precise savings KCP&L estimated* under the all-electric rate as compared to the large general power service rate—something Relator himself never saw before filing his lawsuit. *See* Ex. K (cost sheets). They also show GSA's internal discussion regarding which rates would apply and the savings from those rates (Ex. I, Ramirez email), and its memorandum stating that GSA decided the all-electrical option was the "most economical" choice. *See* Ex. M. And of course, they include the document that, in his Complaint, Relator relies upon to argue that KCP&L's statements were false, since the MPSC would have had to approve the applicability of the all-electric rate: Trigen's "prophecy" letter (Exs. B; H).

Additionally, Joshua Trader's sworn April 15, 2008 MPSC submission, which Relator relies upon in his summary judgment briefing, qualifies under two provisions. First, it is a "report," "an account or announcement that is prepared, presented, or delivered, usually in

formal or organized form." *See Schindler*, 131 S.Ct. at 1893. Second, because it is available online in at least two different formats, it qualifies under the Act's broad view of "news media." *See U.S. ex rel. Oliver v. Philip Morris USA Inc.*, --F.Supp.2d – 2013 WL 2637032 *6-7 (D. D.C. June 13, 2013) (collecting authority showing that "courts that have construed the issue [the definition of 'news media'] have construed the term to include readily accessible websites"). Trader's report confirms GSA's reliance on statements that, for Relator, are "fraudulent."

These materials are more than sufficient to disclose the facts that make up the elements of Relator's claim. Under the FCA, a defendant need only show that "the suit is based upon facts that have already been publicly disclosed as defined in the statute." *U.S. ex rel. Paulos v. Stryker Corp.*, 2013 WL 2666346 (W.D. Mo. June 12, 2013) (citing *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1042 (8th Cir. 2002)). "We do not require the public disclosure of a patently fraudulent transaction to bar a suit under the Act. Rather, the bar is given effect when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *U.S. ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994). Where relators' "claims are simply the logical and obvious consequence of information that was already publicly disclosed," it "is itself included as part of that public disclosure." *Paulos*, 2013 WL 2666346 *8. *See also Oliver*, 2013 WL 2637032 *8 ("the allegations or transactions in the public domain need not irrefutably prove a case of fraud").

Here, although KCP&L disagrees that using all-electric rates to estimate future savings from the all-electric conversion was fraudulent, that is Relator's theory—and the essential

elements of the alleged "fraudulent transaction" was fully articulated[4] in GSA's FOIA response. Accordingly, Relator can only survive the FCA's jurisdictional bar if he is an original source.

## II. Relator Cannot Meet His Burden of Proving He Is an Original Source

To qualify as an "original source," Relator must have done one of two things. First, he must have voluntarily disclosed the information constituting the alleged fraud to the government, even before GSA's FOIA response. 31 U.S.C. § 3730(e)(4)(B)(i). As discussed above, Relator does not claim to have ever disclosed his documents to the government, and in fact, may even have obtained the Trigen letters from his father *after* the GSA's FOIA response.

Second, Relator must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and [have] voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B)(ii). As Relator confirmed at his deposition, his knowledge of the allegedly false "all-electric" promise comes only from the Trigen documents he received from his father, and second-hand scuttlebutt he may have overheard when a GSA worker, and his own boss, would discuss between themselves things they had heard at KCP&L meetings they had been allowed to attend. Relator did not testify that he had provided either set of information to the government before filing suit, but even if he had, it would only be third-hand hearsay that was cumulative of the specific

---

[4] Relator may argue that the Bryant letter was not produced by GSA, and therefore his claim survives. But this is simply another example of the general practice Relator has already alleged in his complaint. *See U.S. ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) ("a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar"); *Oliver*, 2013 WL 2637032 *9 ("Relator's contention that he can provide additional examples of alleged overpricing…does not change this Court's analysis…"). Further, as discussed in the Statement of Facts, Relator had never even seen or heard of the Bryant letter (or any other allegedly express written guarantee) until his counsel received it in discovery in this litigation.

13

documents (including KCP&L's actual proposals and GSA's actual deliberations regarding the rate) that GSA had already disclosed in its FOIA response.

## Conclusion

Relator is the "original source" of no information. He produced a total of 17 pages of rate-related documents in discovery, and they were all materials sent to and received by others. He came upon them only because his father had stored them in his basement after retiring from his job at the Bolling Building. Otherwise, Relator's "information" consists of overheard remarks passed between other employees who themselves overheard discussions between KCP&L and GSA decision-makers. "The False Claims Act is intended to encourage individuals who are either close observers or involved in the fraudulent activity to come forward, and is not intended to create windfalls for people with secondhand knowledge of the wrongdoing." *U.S. ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003). All of Relator's information has been known to the government, and was publicly released to KCP&L's competitor, Trigen, six years ago. Neither brought its own case. Like the relator whose claims Judge Smith recently dismissed in *Paulos*, Relator has tried to capitalize on the distant, distorted echoes of someone else's transaction. The FCA's public disclosure bar prohibits such opportunistic litigation, and requires dismissal of Relator's "all electric" claim.

14

Respectfully Submitted by:

**GRAVES, BARTLE, MARCUS & GARRETT, LLC**

/s/ Edward D. Greim_____
Todd P. Graves	Mo. Bar No. 41319
Edward D. Greim	Mo. Bar No. 54034
Clayton J. Callen	Mo. Bar No. 59885
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
(816) 256-3181 (telephone)
(816) 256-5958 (facsimile)

*ATTORNEYS FOR DEFENDANT*

15

**CERTIFICATE OF SERVICE**

      This is to certify that a true and correct copy of the above and foregoing instrument to which this certificate is attached was filed via ECF on June 20, 2013, effecting service on the following counsel of record:

> Edward D. Robertson, Jr.  
> Anthony L. DeWitt  
> BARTIMUS, FRICKLETON,  
>  ROBERTSON & GORNY, P.C.  
> 715 Swifts Highway  
> Jefferson City, MO 65109  
> aldewitt@sprintmail.com  
> chiprob@earthlink.net  
>
> Thomas M. Larson  
> United States Attorney  
> 400 E 9th Street, Suite 5510  
> Kansas City, MO 64105  
> (816)426-3130  
> Fax: (816) 426-3165  
> tom.larson@usdoj.gov
>
> Jeffrey J. Carey  
> CAREY LAW FIRM, LLC  
> 229 SE Douglas St., Suite 210  
> Lee's Summit, MO 64063  
> carey@carey-lawfirm.com  
> *Counsel for Relator*

      In addition, a copy of the foregoing was served via U.S. Mail, postage prepaid, on June 20, 2013 to the following:

> Jenelle M. Beavers  
> United States Attorney's Office  
> 1100 West Seventh, Suite 300  
> Tulsa, OK 74119  
> Jenelle.Beavers@usdoj.gov

       /s/Edward D. Greim  
      *Counsel for Defendant KCP&L*

16

Case 4:11-cv-00590-FJG   Document 199   Filed 06/20/13   Page 19 of 19